UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____

PATRICIA MURPHY,

                    Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

                    Defendant.

_____

1:19-cv-20122-NLH

**OPINION**

**APPEARANCES:**

JENNIFER STONAGE
RICHARD LOWELL FRANKEL
BROSS & FRANKEL, PA
725 KENILWORTH AVE
CHERRY HILL, NJ 08002

    *On behalf of Plaintiff*

THERESA ANN CASEY
SOCIAL SECURITY ADMINISTRATION
OFFICE OF THE GENERAL COUNSEL
300 SPRING GARDEN STREET
PHILADELPHIA, PA 19123

    *On behalf of Defendant*

<u>**HILLMAN**</u>, **District Judge**

    This matter comes before the Court pursuant to Section

205(g) of the Social Security Act, as amended, 42 U.S.C. §

405(g), regarding Plaintiff's application for Disability

Insurance Benefits ("DIB")[1] under Title II of the Social Security

_____

[1] DIB is a program under the Social Security Act to provide
disability benefits when a claimant with a sufficient number of

Act.  42 U.S.C. § 423, et seq.  The issue before the Court is
whether the Administrative Law Judge ("ALJ") erred in finding
that there was "substantial evidence" that Plaintiff was not
disabled at any time since her alleged onset date of disability,
June 1, 1998.  For the reasons stated below, this Court will
reverse that decision and remand the matter for further
proceedings.

I.    BACKGROUND AND PROCEDURAL HISTORY

Plaintiff, Patricia Murphy, protectively filed an
application for DIB[2] on July 6, 2010, alleging an onset date of
June 1, 1998.  Plaintiff claims that she can no longer work in
her former occupations as a receptionist, a cantor, a collector,
and a substitute teacher because of her neuropathy, malignant
schwannoma, optic neuritis, arthritis, knee replacement, and
herniated discs.

Plaintiff's DIB application was denied on March 28, 2012,

---

quarters of insured employment has suffered such a mental or
physical impairment that the claimant cannot perform substantial
gainful employment for at least twelve months.  42 U.S.C. § 423
et seq.

[2] A protective filing date marks the time when a disability
applicant made a written statement of his or her intent to file
for benefits.  That date may be earlier than the date of the
formal application and may provide additional benefits to the
claimant.  See SSA Handbook 1507; SSR 72-8.

and after the Appeals Council denied Plaintiff's request for review on July 23, 2013, she appealed the ALJ's decision to the District Court.  On November 12, 2014, Judge Robert B. Kugler, U.S.D.J., reversed the ALJ's decision and remanded the matter for further proceedings consistent with his Opinion.  (1:13-cv-05508-RBK, Docket No. 35.)

Over the course of several years, Plaintiff's DIB application proceeded at the administrative level.  Ultimately, on January 10, 2019, the ALJ found that Plaintiff was not disabled and she was capable of performing sedentary work, which the Appeals Council affirmed on September 20, 2019, thus making the ALJ's decision final.  Plaintiff brings this civil action for review of the Commissioner's decision for a second time.

II.  DISCUSSION

A.    Standard of Review

Under 42 U.S.C. § 405(g), Congress provided for judicial review of the Commissioner's decision to deny a complainant's application for social security benefits.  Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995).  A reviewing court must uphold the Commissioner's factual decisions where they are supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001); Sykes v.

Apfel, 228 F.3d 259, 262 (3d Cir. 2000); Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).  Substantial evidence means more than "a mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971)(quoting Consolidated Edison Co. V. NLRB, 305 U.S. 197, 229 (1938)).  It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id.  The inquiry is not whether the reviewing court would have made the same determination, but whether the Commissioner's conclusion was reasonable.  See Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).

A reviewing court has a duty to review the evidence in its totality.  See Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984).  "[A] court must 'take into account whatever in the record fairly detracts from its weight.'"  Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (quoting Willbanks v. Secretary of Health & Human Servs., 847 F.2d 301, 303 (6th Cir. 1988) (quoting Universal Camera Corp. V. NLRB, 340 U.S. 474, 488 (1951)).

The Commissioner "must adequately explain in the record his reasons for rejecting or discrediting competent evidence."  Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)).  The Third

4

Circuit has held that an "ALJ must review all pertinent medical evidence and explain his conciliations and rejections." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000). Similarly, an ALJ must also consider and weigh all of the non-medical evidence before him. Id. (citing Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)); Cotter v. Harris, 642 F.2d 700, 707 (3d Cir. 1981).

The Third Circuit has held that access to the Commissioner's reasoning is indeed essential to a meaningful court review:

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978). Although an ALJ, as the fact finder, must consider and evaluate the medical evidence presented, Fargnoli, 247 F.3d at 42, "[t]here is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record," Hur v. Barnhart, 94 F. App'x 130, 133 (3d Cir. 2004). In terms of judicial review, a district court is not "empowered to weigh the evidence or

substitute its conclusions for those of the fact-finder."
Williams, 970 F.2d at 1182.  However, apart from the substantial
evidence inquiry, a reviewing court is entitled to satisfy
itself that the Commissioner arrived at his decision by
application of the proper legal standards.  Sykes, 228 F.3d at
262; Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983);
Curtin v. Harris, 508 F. Supp. 791, 793 (D.N.J. 1981).

   **B.   Standard for DIB**

   The Social Security Act defines "disability" for purposes
of an entitlement to a period of disability and disability
insurance benefits as the inability to engage in any substantial
gainful activity by reason of any medically determinable
physical or mental impairment which can be expected to result in
death, or which has lasted or can be expected to last for a
continuous period of not less than 12 months.  See 42 U.S.C. §
1382c(a)(3)(A).  Under this definition, a Plaintiff qualifies as
disabled only if her physical or mental impairments are of such
severity that she is not only unable to perform her past
relevant work, but cannot, given her age, education, and work
experience, engage in any other type of substantial gainful work
which exists in the national economy, regardless of whether such
work exists in the immediate area in which she lives, or whether

a specific job vacancy exists for her, or whether she would be

hired if she applied for work.   42 U.S.C. § 1382c(a)(3)(B)

(emphasis added).

The Commissioner has promulgated regulations[3] for

determining disability that require application of a five-step

sequential analysis.   See 20 C.F.R. § 404.1520.   This five-step

process is summarized as follows:

1.   If the claimant currently is engaged in substantial
     gainful employment, she will be found "not disabled."

2.   If the claimant does not suffer from a "severe
     impairment," she will be found "not disabled."

3.   If the severe impairment meets or equals a listed
     impairment in 20 C.F.R. Part 404, Subpart P, Appendix
     1 and has lasted or is expected to last for a
     continuous period of at least twelve months, the
     claimant will be found "disabled."

4.   If the claimant can still perform work she has done in
     the past ("past relevant work") despite the severe
     impairment, she will be found "not disabled."

5.   Finally, the Commissioner will consider the claimant's
     ability to perform work ("residual functional
     capacity"), age, education, and past work experience
     to determine whether or not she is capable of
     performing other work which exists in the national
     economy.   If she is incapable, she will be found
     "disabled."   If she is capable, she will be found "not
     disabled."

---

[3] The regulations were amended for various provisions effective
March 27, 2017.   See 82 F.R. 5844.   None of these amendments
directly impacts the resolution of Plaintiff's appeal.

20 C.F.R. § 404.1520(b)-(f).  Entitlement to benefits is therefore dependent upon a finding that the claimant is incapable of performing work in the national economy.

This five-step process involves a shifting burden of proof. See Wallace v. Secretary of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983).  In the first four steps of the analysis, the burden is on the claimant to prove every element of her claim by a preponderance of the evidence.  See id.  In the final step, the Commissioner bears the burden of proving that work is available for the Plaintiff: "Once a claimant has proved that he is unable to perform his former job, the burden shifts to the Commissioner to prove that there is some other kind of substantial gainful employment he is able to perform." Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987); see Olsen v. Schweiker, 703 F.2d 751, 753 (3d Cir. 1983).

**C.  Analysis**

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability.  At step two, the ALJ found Plaintiff's impairments of osteoarthritis of bilateral knees, status post multiple surgeries, and major joint dysfunction to be severe.  At step three the ALJ determined that Plaintiff's severe impairments or

her severe impairments in combination with her other impairments
did not equal the severity of one of the listed impairments.
For steps four and five, the ALJ determined that Plaintiff could
perform her past work as collector, which job is of a sedentary
exertional level and exists in sufficient numbers in the
national economy, as well as several other jobs at the sedentary
level.[4]

Plaintiff's bases for her appeal of the ALJ's decision
center on the ALJ's failure to follow the direction of Judge
Kugler in his remand decision, and that failure to do so
compounded the errors committed by the prior ALJ and resulted in
the second improper denial of her DIB application.  The Court
agrees that the ALJ erred in two ways, thus rendering the ALJ's
decision unsupported by substantial evidence.

1.   **The ALJ erred in the assessment of Plaintiff's testimony and daily living activities**

This Court finds that the ALJ's assessment of Plaintiff's
purported daily living activities, upon which the prior ALJ and
the current ALJ significantly based their RFC determination, is
without support in the record, or at a minimum, should have been

---

[4] See 20 C.F.R. § 404.1567 ("Physical exertion requirements. To
determine the physical exertion requirements of work in the
national economy, we classify jobs as sedentary, light, medium,
heavy, and very heavy.").

more fully reconciled with Plaintiff's testimony and other record evidence.

Judge Kugler's Opinion recounted that "the ALJ determined none of Plaintiff's testimony regarding the intensity and persistence of her symptoms during the critical period was credible because of one treatment note from 1998 that said she was working as a horse trainer." (1:13-cv-05508-RBK, Docket No. 35 at 30.)   Judge Kugler pointed out that "the ALJ did not explain why this single treatment note from 1998 discredited Plaintiff's testimony regarding the intensity and persistence of her symptoms from 1999-2003." (Id.)   Judge Kugler concluded, "in light of the ALJ's failure to take into consideration the retrospective opinions of Dr. Bussey, Dr. Abboud, and Dr. Diermengian because they were not based on contemporaneous objective medical findings or evidence, but which support Plaintiff's testimony, the Court will remand because the ALJ's credibility determination was not based on substantial evidence." (Id.)   Judge Kugler also directed, "[t]he ALJ should resolve whether Plaintiff was in fact a horse trainer since it was not listed as past employment, on her earnings sheet, or mentioned in her testimony." (Id. at 30 n.11.)

On remand, and after a hearing before a second, different

ALJ, the second ALJ found:

> [T]he claimant described daily activities, which are not
> limited to the extent one would expect, given the
> complaints of disabling symptoms and limitations.  During
> the relevant period under review, the claimant lived with
> others, but otherwise appeared to be independent in her
> self-care.  She was able to give birth to two children,
> raise t[w]o children, exercise on a bicycle, work on a
> farm, and train horses.  If she had the level of functional
> loss alleged, she likely would not be able to do such
> tasks.

(R. at 763.)  The ALJ further considered that Plaintiff "was

able to get married and dance at her wedding."  (R. at 762.)

At the hearing before the ALJ, however, Plaintiff explained

how the prior - and now the current - ALJ incorrectly described

these daily living activities.  For the repeated misconception

that she was a horse trainer, Plaintiff testified that she never

worked as a horse trainer.  She elaborated, "At the time my

husband had a horse and Bruce Springsteen came to the farm and

wanted to purchase it.  And he brought his trainer and the

trainer said that the horse needed to be trained a little more.

So the trainer actually came to our farm and trained the horse

for a month to his specifications for his children.  I went to

Dr. Gregg.  He said how are things going?  And I said oh, great,

we have a horse trainer coming to the farm.  Bruce Springsteen

wants to buy our horse.  And he was like, oh, now you're a

trainer.  And that was it.  He also called me a rosy cheek fair-

haired Irish girl.  My name is [INAUDIBLE].  I am far from fair,
I am far from light, and I'm far from rosy."  (R. at 815.)

Regarding birthing and raising two children, the ALJ
stated, "It seems to me as a male that having a child as a woman
is a very significant medical event. . . .  And I sometimes
factor that into the underlying problems that the woman has as
we travel along this medical route.  And I'm reading these
records from Dr. Gregg, and actually these are pretty critical
to the decision of the case, but he is saying that she had had a
child sometime during that.  When was your baby born?"  (R. at
810.)  Plaintiff testified that she had two very difficult
pregnancies.  In 1999, at six months gestation of a twin
pregnancy, Plaintiff lost one of the twins and the other had to
be delivered via emergency caesarian section two months early.
In 2002, she delivered her second daughter one month early also
by caesarian section because of complications.  Plaintiff
explained that she required fertility treatments to conceive her
pregnancies, and that "both were C-sections because my
neuropathy didn't lend me to feeling contractions."  (R. at 812-
13.)

Plaintiff's treating physician, Dr. Gregg, testified at the
second hearing, and discussed Plaintiff's pregnancies and

12

raising two children.  The ALJ asked Dr. Gregg, "if the person
is like strong enough or good enough or well enough to go
through a full-term pregnancy and a natural delivery, isn't that
some indication of their ability to function?"  (R. at 810-811.)
Dr. Gregg answered, "I would say so in a generic sense.
However, to offer a glimpse of what she looked like in '06, she
was in a straight-leg brace because the knee was completely
useless.  I have to imagine that she was to some degree prior to
that.  Could a person walk with a peg leg?  She's living proof
of it.  As far as the shoulder could she hold her baby?  I think
the devices of the time were very helpful, such as putting a
baby in a chair and feeding.  I would offer my opinion that
clearly her childbirth, her childrearing days were not easy.
But I would caution looking at her ability to care for her
children I think is markedly different than working in a job.  I
would think that her husband, who I know very well, is a strong
gentleman who probably provided the marked amount of physical
activity."  (R. at 811.)

     Dr. Gregg continued, "Clearly, I think anybody who is
disabled still would like to have kids.  I think that's an event
that no matter what you're going to go through.  Could she walk
around with her kid?  Likely not.  Could she push the child in a

carriage?  Probably not.  You know she did go on to have knee
replacement.  She has been evaluated by Johns Hopkins for
neurologic issues that only a handful of people ever get that
opportunity.  But can I tell you the fact she lost one of her
kids, the fact that she only had two children I think that it's
very been on her."  (Id.)

As for the ALJ's consideration that Plaintiff danced at her
wedding, Plaintiff testified, "[I]n 1981 Dr. Gregg did my first
knee surgery which was a lateral release, and subsequently for
the next few years he did patella drills, ACL repairs,
osteoarthritis removal, chondromalacia removal.  And he said to
me I promise you when you get married I will dance with you at
your wedding.  And that wonderful man came and did a slow dance
at my wedding."  (R. at 816.)

Despite this testimony, in his decision the ALJ repeatedly
relied upon Plaintiff's incorrect status as a horse trainer,
having "naturally" birthed and raised two children, and having
"danced" at her wedding to negate Plaintiff's claims of
disability, discredit her treatment providers, and support his
conclusion that she retained the RFC to perform work in the
national economy.  The ALJ referred to these mischaracterized
examples of Plaintiff's daily living activities nine times in

14

his decision when discrediting Plaintiff's testimony and medical
evidence.  (R. at 759 ¶ 2; 761 ¶¶ 3 & 6; 762 ¶¶ 1, 3 & 4; 763 ¶¶
3 & 5; 764 ¶ 1; 765 ¶ 1.)

    Notably, in one of the nine references, the ALJ completely
misrepresented the testimony, recounted above, from the hearing
before the ALJ.  In finding that "the claimant's allegations of
disability are not consistent with the evidence of record," the
ALJ stated that Plaintiff "admitted" she could "train horses
shortly following her right knee surgery," and "she failed to
mention at her hearings that she was a horse trainer for Bruce
Springsteen during the relevant period under review."  (R. at
763.)  Based on this, the ALJ found, "[t]hese are major
inconsistencies and do not support a finding of greater
limitations in the claimant."  (Id.)

    Defendant attempts to minimize the ALJ's repeated reliance
on the mischaracterized daily living activities by arguing the
ALJ looked to Plaintiff's other medical records and activities
to support his decision, which Defendant contends satisfies the
ALJ's duty to support his decision with substantial evidence.
The Court does not agree.  While the ALJ considered other
evidence, in doing so the ALJ referred to the purported horse
training, raising children, and dancing to detract from that

15

other evidence.  The ALJ's improper misconstruction of those
activities was integral to the assessment of the other evidence
such that it cannot be carved out and still leave a fully
supported decision.

Therefore, the ALJ's error with regard to Plaintiff's daily
living activities is two-fold.  First, the ALJ flouted the
fundamental principle of the substantial evidence standard that
an ALJ must set out a specific factual basis for each finding,
and that "when a conflict in the evidence exists, the ALJ may
choose whom to credit but cannot reject evidence for no reason
or for the wrong reason."  Cotter v. Harris, 642 F.2d 700, 706
(3d Cir. 1981).  In the converse misapplication of this
principle, the ALJ here credited evidence that was flatly wrong.
The ALJ also rejected evidence that was unrebutted by contrary
evidence.

Second, the ALJ improperly assessed Plaintiff's
credibility.  Effective March 26, 2016, the SSA issued Social
Security Ruling 16-3p, which superseded SSR 96-7p, to eliminate
the use of the term "credibility."  SSR 16-3p explains, "We
solicited a study and recommendations from the Administrative
Conference of the United States (ACUS) on the topic of symptom
evaluation. Based on ACUS's recommendations and our adjudicative

16

experience, we are eliminating the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term. In doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character. Instead, we will more closely follow our regulatory language regarding symptom evaluation.... In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation." SSR 16-3p.

The ALJ found that Plaintiff's lied about being a horse trainer because she had "admitted" to being one, and then keeping that fact secret at the hearing before him, resulting in "major inconsistencies" which cast doubt on the veracity of her subjective complaints and the medical evidence as a whole. The unrebutted evidence shows that Plaintiff was never a horse trainer, and the hearing transcript plainly shows that a major topic of questioning at the hearing was with regard to this misconception. The ALJ discounted Plaintiff's subjective complaints based on a non-existent inconsistency. In doing so, it also appears that the ALJ inappropriately questioned Plaintiff's "overall character or truthfulness."

It is difficult to understand how the misconception that

Plaintiff herself physically trained horses for a "national
music celebrity" (R. at 762) has perpetuated since at least
Judge Kugler's November 12, 2014 remand Opinion, when on
numerous occasions Plaintiff has directly dispelled that myth
and no evidence suggests otherwise.  The ALJ's reliance on this
misconception, along with other unsupported mischaracterizations
of Plaintiff's physical abilities arising from rearing children
and dancing at her wedding, permeates the ALJ's decision.  As
stated above, these errors cannot be separated from the ALJ's
analysis of other record evidence such that the Court may
determine whether substantial evidence supports the ALJ's RFC
analysis.[5]  The ALJ's decision must be remanded to correct these
errors.

> **2.    The ALJ erred in his assessment of the
>         consultative neurologist**

In his November 12, 2014 Opinion, Judge Kugler found that
the prior ALJ erred in the consideration of Plaintiff's
neurological impairments.  Judge Kugler directed that on remand,
"the ALJ must consider Plaintiff's testimony and the

---

[5] The Court notes that "[d]isability does not mean that a
claimant must vegetate in a dark room excluded from all forms of
human and social activity. . . .  It is well established that
sporadic or transitory activity does not disprove disability.").
Smith v. Califano, 637 F.2d 968, 971–72 (3d Cir. 1981).

retrospective opinions of Dr. Bussey and Dr. Abboud, in accordance with SSR 83-20, to determine whether Plaintiff's keloid, peripheral neuropathy, migraines, and shoulder impairment were medically determinable impairments during the critical period."  (1:13-cv-05508-RBK, Docket No. 35 at 27.) Judge Kugler also directed that "the ALJ should seek the help of a medical advisor to aid in this determination" because "the only medical records from the critical period are those of Plaintiff's orthopedist, who treated her only for her knees." (Id.)

On remand, a medical interrogatory was completed by Dr. James Parker, a state consultative neurologist, on April 30, 2017.  Dr. Parker noted that the Plaintiff's condition would be evaluated under 11.17, and that criteria "A" were not met, and he then noted "significant but not quite listing level 1.02A." (R. at 1822.)  Dr. Parker further opined "even though criteria for 11.17 not met, Plaintiff could not work 8 hours per/day 40 hours per week on sustained basis."  (R. at 1823.)

The ALJ informed Plaintiff's counsel that he intended to admit this report into the record, as well as Dr. Parker's answers to a subsequent medical source statement ("MSS") form sent to Dr. Parker by the ALJ.  Plaintiff's counsel responded

19

that the MSS was missing answers to several questions concerning Plaintiff's ability to remain on task or to complete activities without interruption or absences.  (R. at 1304.)  Plaintiff's counsel requested that he be permitted to propound additional interrogatories to Dr. Parker, but the ALJ denied that request, stating that because Dr. Parker would be appearing in person or by telephone during the hearing, Plaintiff's counsel could ask those additional questions then.  (Id.)  Six days before the hearing, however, Plaintiff's counsel learned that Dr. Parker declined to testify, and Plaintiff's counsel renewed his request to serve the interrogatories to Dr. Parker.  (Id.)  The ALJ denied this request.

Plaintiff points out that the ALJ, without explanation, redacted the MSS form sent to Dr. Parker, which eliminated questions regarding use of hands and feet, postural activities, visual impairment, which was particularly relevant to the doctor's conclusion of optic neuropathy, environmental restrictions, and activities of daily living, and omitted the space for the doctor to provide any other work activities or limitations.  Plaintiff further points out that the entire MSS form was sent to other treating and consultative medical sources.

Plaintiff argues that these questions would have provided the answers the ALJ was ostensibly seeking in light of the non-exertional nature of these impairments and Dr. Parker's opinion that Plaintiff could not complete a normal workday.  Plaintiff claims that the ALJ sent a redacted MSS without any apparent purpose other than to restrict Dr. Parker's ability to explain his reasoning for believing Plaintiff could not work.  Plaintiff further challenges the ALJ's refusal to permit Plaintiff to submit interrogatories to Dr. Parker to answer the relevant questions missing from the redacted MSS.  Plaintiff contends that the ALJ's actions violated the fundamental fairness of the hearing she is entitled to under the SSA regulations, and that the ALJ failed to comply with Judge Kugler's remand order, which required the ALJ to consider a neurologist's full opinion as to Plaintiff's neurological limitations.

The Court agrees with Plaintiff.  In his decision, the ALJ addressed Dr. Parker's opinion and his absence at the hearing as follows:

> The undersigned notes that the claimant's representative argued Dr. Parker's opinion be given weight and additional interrogatories be sent to Dr. Parker for further clarification of his opinion (Hearing Testimony and Exhibit 35E).  This request is denied.  As explained, Dr. Parker declined to testify regarding his opinion and therefore avoided cross-examination of his opinion.  Such scrutiny is needed in cases such as this one.  For example, the

21

> questioning of John Kwock, M.D., revealed he based his
> written opinion on the wrong period of time and had he not
> been questioned at the hearing this fact would likely not
> have been discovered.  Given the remoteness of the
> claimant's date last insured compared to the majority of
> the medical evidence, it is crucial that all opinions in
> the record sufficiently reflect why the claimant was
> limited and when those limitations were present.  Dr.
> Parker's opinion, just like the opinions of Drs. Fuchs and
> Sklaroffa does not adequately explain those two parameters.

(R. at 766.)

It is unclear from the record why Dr. Parker declined to

testify at the hearing, but whatever the reason, the ALJ

improperly construed Dr. Parker's absence against Plaintiff.  It

is evident that prior to the hearing, Plaintiff on multiple

occasions requested more information from Dr. Parker as a result

of the ALJ's redaction of the MSS he sent to Dr. Parker, but the

ALJ denied that request, stating that Dr. Parker could be

questioned at the hearing.  When Plaintiff learned that Dr.

Parker would not be appearing at the hearing, Plaintiff again

requested that the ALJ submit additional questions to Dr.

Parker, but the ALJ denied that request, and the ALJ again

denied Plaintiff's third request made after the hearing.  In his

decision, the ALJ stated that the scrutiny of cross-examination

as to Dr. Parker's opinion was "crucial" in this case, yet the

ALJ's repeated denial of Plaintiff's efforts to obtain more

clarifying information from Dr. Parker prevented that very

scrutiny.

Moreover, Dr. Parker is a state consultative examiner enlisted by the SSA in an attempt to comply with Judge Kugler's directions on remand, not one of Plaintiff's own treating physicians.  The opinion of Dr. Parker was integral to the assessment of Plaintiff's neurological impairments because he was the only neurologist to opine on how her neurological impairments affected her ability to work, and it is the ALJ's duty to develop a full record.  See Ventura v. Shalala, 55 F.3d 900, 902 (3d Cir. 1995) ("ALJs have a duty to develop a full and fair record in social security cases.").

Under the regulations, "When it is reasonably necessary for the full presentation of a case, an administrative law judge or a member of the Appeals Council may, on his or her own initiative or at the request of a party, issue subpoenas for the appearance and testimony of witnesses and for the production of books, records, correspondence, papers, or other documents that are material to an issue at the hearing."  20 C.F.R. § 404.950. Moreover, SSA's "Hearings, Appeals and Litigation Law Manual," or HALLEX,[6] provides direction to ALJs with regard to medical

---

[6] HALLEX stands for the SSA's "Hearings, Appeals and Litigation Law Manual."  It is intended to convey "guiding principles, procedural guidance and information to the Office of Hearings

23

source testimony, and empowers ALJs to obtain the necessary

information to decide a disability claim.  HALLEX I-2-5-18

provides,

> In unusual circumstances, a claimant may request that his or her medical source testify at the hearing, or an administrative law judge (ALJ) may decide on his or her own that testimony from a medical source is needed to fully inquire into the matters at issue.  Unless a medical source has already agreed to testify at a hearing, whenever possible, an ALJ will first try to obtain the needed evidence through other methods, such as interrogatories (using the same general instructions in HALLEX I-2-5-42), written affidavits, or telephone reports to hearing office staff (see HALLEX I-2-5-14 C.4.).

> When other efforts have failed and the ALJ finds it is reasonably necessary for a medical source to testify at a hearing, an ALJ may ask the medical source to appear at a hearing voluntarily, typically by telephone.  The ALJ will enter into the record any correspondence and other documentation of efforts to obtain the medical source's testimony voluntarily.

> If a medical source does not agree to testify at a hearing and the claimant requests a subpoena to compel the appearance of the medical source at the hearing, or if the ALJ determines that it is reasonably necessary to have the medical source testify at a hearing, the ALJ will evaluate the request using the instructions in HALLEX I-2-5-78.

HALLEX I-2-5-18.

Here, the ALJ failed to utilize any of the tools available

---

and Appeals ("OHA") staff. . . .  It also defines procedures for carrying out policy and provides guidance for processing and adjudicating claims at the Hearing, Appeals Council, and Civil Action levels."  HALLEX § I-1-0-1, Purpose, https://www.ssa.gov/OP_Home/hallex/I-01/I-1-0-1.html.

24

to him to compel Dr. Parker to testify at the hearing, despite stating that cross-examination of Dr. Parker was "needed in cases such as this one."  The ALJ then misplaced the blame for Dr. Parker's non-appearance on Plaintiff, who tried on multiple occasions to obtain more information from Dr. Parker, but was stymied at every turn by the ALJ.[7]

Plaintiff contends that the ALJ intentionally endeavored to bury Dr. Parker's opinion and undermine Plaintiff's efforts to obtain more information from Dr. Parker because Dr. Parker's initial opinion supported Plaintiff's neurological disabilities. The Court will not opine on the ALJ's intentions, but it is evident that the ALJ erred in his handling of Dr. Parker's consultative source opinion.  This is a second basis for remand so that the required "full and fair record" is developed by ALJ. See Ventura, 55 F.3d at 902 (citing 42 U.S.C. § 405(b)(1)) (providing that the Social Security Act gives those claiming disability benefits a right to a hearing, and although the hearing is informal in nature, due process requires that any hearing afforded claimant be full and fair).

---

[7] Ironically, during the hearing the ALJ stated that he should thank Dr. Cohen, a state consultative examiner, for coming to the hearing "because he is one of the few that comes in here live as well.  And I probably wouldn't have been able to get an orthopod in here live anyway."  (R. at 816-17.)

## III. Conclusion

The ALJ's decision in this case is not supported by substantial evidence.  The ALJ not only failed to comply with Judge Kugler's instructions on Plaintiff's first appeal of the denial of her disability benefits claim,[8] but he repeated and compounded the same errors that gave rise to the prior remand.[9]

The decision of the ALJ is therefore reversed, and the matter must be remanded.  Defendant is directed - again - to reopen and fully develop the record as to Plaintiff's daily living activities and her neurological impairments, so that the RFC determination and the ultimate disability determination may be properly supported.[10]  See Thomas v. Commissioner of Social

---

[8] See, e.g., Orta v. Commissioner of Social Security, 2020 WL 525939, at *4 (D.N.J. 2020) (remanding a second time because the ALJ failed to comply with district court's prior remand instructions); K.K. on behalf of K.S. v. Comm'r of Soc. Sec., 2018 WL 1509091, at *7 (D.N.J. 2018) (same).

[9] With regard to the current ALJ having to consider a claim that had previously been decided by a different ALJ, the current ALJ stated at the hearing, "I've been candid with you about the animus that the rehearing Judge has about other Judge's remands."  (R. at 816.)

[10] The RFC analysis considers severe and non-severe impairments in combination.  See 20 C.F.R. § 404.1545(a)(2).  In consideration of Plaintiff's prior appeal, Judge Kugler directed that the ALJ was to consider the impact of Plaintiff's keloid, migraines and right shoulder impingement, which the ALJ had concluded were not severe, in the RFC analysis.  Because on remand the ALJ must reformulate Plaintiff's RFC after the

Sec. Admin., 625 F.3d 798, 800–01 (3d Cir. 2010) (explaining
that even though a formulaic process is not required on remand,
a district court must give the Commissioner explicit
instructions to fully develop the record in order to ensure that
the parties have an opportunity to be heard on the remanded
issue and prevent post hoc rationalization by administrative law
judges).

An accompanying Order will be issued.


Date: November 30, 2020                    s/ Noel L. Hillman
At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.

---

development of a full record, the assessment of these
impairments should be encompassed in that reformulation.